IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>EUGENE CHARLES WILLIAMS, JR.,<br><br>Defendant. | CRIM. ACTION NO.: 5:22CR18<br>(BAILEY) |

FILED
AUG 25 2022
U.S. DISTRICT COURT-WVND
WHEELING, WV 26003

### REPORT AND RECOMMENDATION

Currently pending before the Court is Defendant's Motion [15] to Suppress Evidence, filed July 28, 2022. The Government filed its Response in Opposition on August 8, 2022. Defendant filed a reply brief on August 12, 2022. A hearing was held on August 15, 2022. After considering the parties' arguments, the applicable law, and the Court file, and after considering the arguments made during the hearing of August 12, 2022, the undersigned would recommend that Defendant's Motion be granted.

### I.
### FACTUAL/PROCEDURAL HISTORY

Defendant was indicted on June 7, 2022, on one count of Unlawful Possession of a Firearm, and one count of Obliterated Serial Number. The indictment arises out of Defendant's contact with police officers on January 17, 2022, in Brooke County, in the Northern District of West Virginia. On that date, Defendant was involved in a single-car accident at approximately 6:30pm while traveling on US Route 22 Eastbound at or near the Three Springs Drive exit in Weirton, WV. Officers encountered Defendant's vehicle after it slid off the roadway and came to

a rest on top of a light pole. Officers asked Defendant for his driver's license, which Defendant provided, and proof of insurance. Proof of insurance was on Defendant's phone, and he appeared to be having a hard time retrieving the information. Officers believed Defendant needed medical attention. While EMTs attended to Defendant in an ambulance at the scene, officers entered Defendant's vehicle without a warrant, looking for Defendant's insurance card. In the center console, Officers found a loaded Remington, RP9, 9mm handgun. The serial numbers had been filed down so that the same were unreadable. That handgun forms the basis of the instant indictment.

Officer Ammann, who was the first officer on the scene, testified during the hearing. Officer Thompson, who assisted at the scene, also testified. Officer Ammann's body camera video was admitted into evidence, as was a copy of the police report generated as a result of this encounter. A copy of the Weirton Police Department's Policies and Procedures for Towing Vehicles was also admitted into evidence. A summary of evidence[1] is set forth below.

A. **Officer Ammann's Testimony**

Officer Ammann is a patrolman with the Weirton Police Department and has been for approximately four (4) years. Among other things, he is responsible for responding to and investigating automobile accidents and writing reports for the same. To investigate an accident and prepare the accident report, he obtains the information of the driver and every occupant in the vehicle, as well as the insurance and registration information for the vehicle.

On the day of Defendant's accident, January 17, 2022, Officer Ammann was driving on US Route 22 Eastbound when he pulled up to the accident scene. Defendant's vehicle was off the

---

[1] Both the Weirton Police Department's Policies and Procedures for Towing Vehicles and the police report are relatively brief documents and are self-explanatory. As a result, the Court will not summarize those here. They are filed with the Court at ECF No. 21-2 and ECF No. 21-3.

roadway at the Three Springs Drive exit ramp. Officer Ammann turned on his body camera before exiting his patrol car. Officer Ammann intended to determine who was in the vehicle and see if they needed medical attention. Though Defendant was responsive and was able to identify himself and was able to describe what happened as far as the accident, Defendant appeared to be shaken up, as if he had hit his head. He was distraught and confused. Officer Ammann notified EMS of the need for them to respond to the scene. Officer Ammann waited with Defendant until they arrived.

While waiting, he asked Defendant for his driver's license and proof of insurance. Defendant provided his driver's license. Officer Ammann learned from dispatch that his license had been administratively suspended. Additionally, Defendant advised he had his proof of insurance on his phone. Officer Ammann needed Defendant's insurance information to include the same in the accident report. Defendant began looking for proof of insurance on his phone by swiping through different text messages. Officer Ammann told him not to worry about it until he was seen by EMS. Officer Ammann was concerned for Defendant's well-being.

Officer Ammann could not have arrested Defendant for driving on a suspended license because it had been administratively suspended. He also could not have arrested Defendant for driving without proof of insurance.

After the EMTs arrived, Officer Ammann walked away from Defendant towards other officers on scene, including Officer Thompson. Officer Ammann directed Officer Thompson to get Defendant's insurance card. He did not direct Officer Thompson to get Defendant's registration card. Officer Ammann acknowledges that it is a violation of state law to drive without valid insurance. It is also a state crime to drive with a suspended license. He intended to give Defendant a ticket. At that point, Officer Ammann was suspicious that Defendant did not have

3

valid insurance for the vehicle. His investigation did not become a criminal investigation, but he did begin filling out the citation in his patrol car. He did not expect to find evidence of criminal activity on Defendant or in Defendant's vehicle.

Prior to Officer Thompson's search of Defendant's vehicle, Defendant was still on the scene (in the ambulance). Officer Ammann could have asked him for consent to search his vehicle, but he did not. Defendant did not give consent for Officers to search his vehicle. When the gun was located inside of Defendant's vehicle, Officer Ammann was not conducting a criminal investigation. He did not know whether Defendant was permitted to possess a firearm. At that point, Officer Ammann intended to follow Defendant to the hospital and issue Defendant a traffic summons for driving on a suspended license and possibly having no proof of insurance. Officer Thompson (the officer who searched Defendant's vehicle) could not locate an insurance card for Defendant's vehicle. If Defendant had shown Officer Ammann proof of insurance on Defendant's phone, Officer Ammann would not have given Defendant a ticket for driving without insurance.

While Officer Thompson was searching Defendant's vehicle, Defendant was not free to roam about near the car. He was unable to reach into the passenger compartment of the car because he was in the ambulance. Officer Ammann could have gone back to the ambulance and asked Defendant to look on his phone, but he did not do that. When Defendant was in the ambulance being treated, Officer Ammann did not want to have a long conversation with him because Officer Ammann wanted Defendant to go to the hospital. Officer Ammann felt Defendant needed medical treatment.

Officer Ammann was required to prepare a full state accident report for Defendant's accident because of the nature of the accident and the fact that Defendant hit a DOT pole. To prepare a state accident report, Officer Amman is required to provide driver's license information,

4

vehicle information, insurance information, a short narrative, and a short diagram. To complete these reports, he uses driver's licenses, registration cards, and insurance cards. The state accident report documents the accident; it does not denote a criminal investigation. Officer Ammann did not ask Defendant for a copy of his registration.

Officer Ammann intended to have Defendant's vehicle towed because Defendant was being transported to the hospital and because the vehicle was impeding traffic. Prior to towing a vehicle, the Weirton Police Department conducts an inventory check of the vehicle for liability purposes. They conduct this inventory check every time a vehicle is towed. At the time the tow truck arrived, Defendant was already in the back of the ambulance and medical personnel would not let him leave the ambulance to lock his vehicle. (Officer Ammann later acknowledged that the EMTs did not say that to him; this conclusion is based on experience.) Because of that, Officer Ammann felt an inventory check of the vehicle was necessary.

The towing policy for the Weirton Police Department does not require an inventory search if the owner/operator is present when the vehicle is towed. It is up to the officer's discretion. Officers conduct inventories on towed vehicles for liability purposes. There is a form to be filled out when a vehicle inventory is taken. Officer Thompson would have been responsible for filling out that report. He does not know if Officer Thompson completed that report.

Officer Ammann instructed Officer Thompson to look for Defendant's insurance card. He did not instruct Officer Ammann to conduct an inventory search of the vehicle.

### B. Officer Thompson's Testimony

Officer Thompson is employed by the Weirton Police Department and has been so employed since July 10, 2019. He is a K9 officer. He was a K9 officer in January 2022. He was previously a deputy in Jefferson County, Ohio from 2015 to 2019.

On January 17, 2022, dispatch sent him to the motor vehicle accident at issue. Officer Ammann was already on scene when Officer Thompson arrived. Upon arrival, he noticed a vehicle crashed into a light pole off the exit ramp. It appeared that the vehicle was disabled. Defendant was still in his vehicle. Officer Thompson was present when fire/rescue arrived to treat Defendant. He did not engage with Defendant while Defendant was waiting for medical treatment.

He has experience investigating motor vehicle accidents. They are not criminal investigations. To investigate, he needs to obtain a driver's license, proof of insurance, and registration to properly complete the accident report. He has investigated accidents where the driver is in need of medical attention and is outside of the vehicle being treated. In that case, Officer Thompson asks the driver for the same type of information. If it cannot be provided, he looks in the vehicle in common places where that information would be located, i.e., the glovebox or the center console area.

On the day of Defendant's accident, Officer Ammann asked Officer Thompson to locate Defendant's proof of insurance. When so instructed, his first thought was to look in the vehicle in the common places just mentioned so that the accident report could be properly completed. When he began his search, Defendant was not in the vehicle, but was receiving medical treatment. He did not believe he was searching for evidence that Defendant had committed a crime. Officer Thompson looked in the glovebox first, and then he looked in the center console. Officer Thompson found a loaded firearm in the center console. He checked to make sure that the firearm was safe. He stopped searching the vehicle at that time. Officer Thompson saw that the serial number had been scratched off, and he did not feel comfortable continuing the search.

Officer Thompson is aware of the towing policy through the City of Weirton. If a vehicle is in an accident, it is the responsibility of Weirton Police Officers to move the vehicle from the

roadway. If the vehicle is to be towed, it is the policy of the Weirton Police Department to inventory the vehicle.

In addition to looking for the insurance paperwork in Defendant's vehicle, Officer Thompson was also conducting an inventory search. When he located the firearm, he stopped inventorying the vehicle. Before he found the firearm, he had inventoried the entire vehicle. The firearm was the last thing Officer Thompson found. He documented the inventory in the narrative of the police report. He did not prepare an inventory report (the form contained in the Weirton Police Department towing policy). The only items Officer Thompson inventoried from the vehicle were the firearm and ammunition. Those were the only valuables in the vehicle. Officer Thompson did not search the trunk of the car. In his experience, people do not keep their registration and insurance cards in the trunk of their vehicles. He went to the glove box first and to the console second. He did not search the back seat of the vehicle.

Officer Thompson acknowledges that it is a crime to drive without a valid registration and without valid insurance. It is also a crime under West Virginia law to drive while your driver's license has been suspended. Defendant did not provide registration or proof of insurance, which is why Officer Thompson was looking for those items. When Officer Ammann asked him to 'get it,' Officer Amman meant for Officer Thompson to get the registration and insurance.

Officer Thompson does not remember if the ambulance was still on scene when he was searching Defendant's vehicle. He was wearing a body camera that day, but he did not turn it on. The camera was not on at all during the entire encounter. He forgot to turn it on. The Weirton City Police Department's policy on body camera usage is that is should be activated at all times during investigations. Officer Thompson was conducting an investigation. He was second or third

on scene. This was a minor motor vehicle accident. He did not believe he needed to turn on his body camera. He violated the policy.

### C. Body Camera Video

During the hearing of August 15, 2022, the Government introduced into evidence Officer Amman's body camera video. The following is a summary of what appears on the video.

At approximately 18:19:30pm on January 17, 2022, Officer Ammann approaches Defendant's vehicle. The vehicle is visible in the video. It is off the side of a roadway in the snow-covered shoulder/off-road area. Officer Ammann reports to dispatch that a light pole is laying across the exit ramp.

At approximately 18:19:53pm, Officer Ammann makes contact with Defendant and asks if he is alright. Officer Ammann offers for Defendant to be checked out by EMTs. Defendant is upset. Officer Ammann tells him to try to calm down. He calls for a tow truck. Defendant discusses the accident with someone on the phone.

Officer Ammann radios to dispatch and provides the license plate number.

At approximately 18:22pm, Defendant tells Officer Ammann that he is supposed to start his first day of work at Amazon in Imperial/Clinton, PA. They then discuss what happened just prior to the accident. Defendant tells Officer Ammann that the vehicle slid across the highway. Defendant denies losing consciousness. Defendant acknowledges that he was wearing his seatbelt the entire time.

At 18:24:28pm, Officer Ammann asks for Defendant's driver's license. Defendant's hands are visibly shaking when he hands his driver's license to Officer Ammann. Officer Ammann takes the driver's license and walks from the vehicle. He provides the license information to dispatch.

At 18:26:38pm, Officer Ammann asks Defendant if he has any insurance. Defendant replies that he has it on his phone. The policy is through Esurance. Officer Ammann advises that he just needs the policy number to make sure it is valid. At approximately 18:26:54pm, emergency medical personnel arrive at the car and begin to assess the Defendant. At 18:27:16pm, Officer Ammann tells Defendant that he does not need to worry about the insurance at that time, that they will get it after he gets checked out by the EMTs.

At approximately 18:27:46pm, Officer Ammann is advised by dispatch that Defendant has a suspended license. Officer Ammann then voices that "old boy is getting a ticket." At approximately 18:28:28pm, Officer Ammann tells Officer Thompson to get Defendant's insurance information when the EMTs are finished treating him. Officer Ammann then tells Officer Thompson to "look for it" and to "let [him] know if [he has] to have that on the ticket." Officer Thompson goes to Defendant's car to look for proof of insurance and Officer Ammann returns to his vehicle. The ambulance is still on scene.

At approximately 18:32:45pm, Officer Thompson asks Officer Ammann if Defendant told Officer Ammann that he had a gun. Officer Ammann responds 'no.' Officer Thompson appears to continue his search of the vehicle. The ambulance appears to still be on scene. Officer Ammann approaches the vehicle and asks Officer Thompson where the gun was located. Officer Thompson advises that it was in the center console. Officer Ammann can be heard saying, "That's what we like to call being in the wrong place at the wrong time, boys." Officer Thompson states that he cannot find the insurance information. Officer Ammann says that he will include 'no proof of insurance' on the ticket since Defendant did not tell him that Defendant had a gun. The search concludes at approximately 18:34:00pm.

## II.
## ARGUMENTS OF THE PARTIES

### A. Defendant's Arguments

Defendant argues that the search of Defendant's vehicle was an unlawful search in that it was done without a search warrant, and there were no exceptions to the search warrant requirement applicable. Further, there was no probable cause to search the vehicle such that the automobile exception would apply. Finally, Defendant maintains that officers' search of Defendant's vehicle was not a community caretaking activity. Thus, the firearm was unlawfully seized and must be suppressed.

### B. Government's Arguments

The Government contends that the search of Defendant's vehicle was part of Officers' community caretaking function. Additionally, the Government argues that the firearm would have been located notwithstanding the search because Defendant's vehicle was towed from the scene, and its contents would have been inventoried prior to the tow.

## III.
## STANDARDS

The burden of proof for a Motion to Suppress is on the party seeking to suppress the evidence. *United States v. Gualtero*, 62 F.Supp.3d 479, 482 (E.D. Va. 2014) ("[t]he legal standards governing a motion to suppress are clear....[t]he burden of proof is on the party who seeks to suppress the evidence") (citing *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981)). Once the defendant establishes a basis for his Motion, the burden shifts to the Government to prove by a preponderance of the evidence that the challenged evidence is admissible. *Id.* (citing *United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974) ("the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence").

With these standards in mind, the undersigned will turn to the substance of the arguments raised vis-à-vis Defendant's Motion to Suppress.

## IV.
## DISCUSSION

The search of Defendant's vehicle on the evening in question was a warrantless search, which means that the search was *per se* unreasonable. *Katz v. United States*, 389 U.S. 347 (1967). The Government bears the burden of demonstrating that this search was justified despite not having first obtaining a warrant for the same. *United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013). The Government has not met its burden here.

The following facts and conclusions are not disputed: Defendant did not consent to the search, he was not arrested, he was not within reaching distance of the vehicle at the time of the search, and, consistent with the Government's position, officers did not believe evidence of a crime would be located in Defendant's vehicle at the time of the search.[2] *See Arizona v. Gant*, 556 U.S. 332, 351 (2009) ("[p]olice may search a vehicle incident to…arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest….[w]hen these justifications are absent, a search…will be unreasonable unless police obtain a warrant or…another exception to the warrant requirement applies"). Further, officers did not have probable cause to believe contraband would be located inside of the vehicle, and the vehicle was not mobile. *See United States v. Davis*,

---

[2] To the extent it is argued that the insurance card could be considered as proof of the violation of driving without insurance, the undersigned would reject such a conclusion. The citation issued to Defendant was for not having proof of insurance. Locating an insurance card in the vehicle would prove that no violation had occurred, which is the very opposite of evidence of a crime. To the extent the Government would argue that officers were attempting to locate the insurance card to avoid citing Defendant for driving without proof of insurance as part of their community care activity, the undersigned would similarly reject this argument. The reasons for said rejection will be discussed, *infra*.

11

997 F.3d 191, 201 (4th Cir. 2021) (holding that "police can search a vehicle without first obtaining a warrant if the vehicle 'is readily mobile and probable cause exists to believe it contains contraband"). The Government nevertheless contends that the community caretaking exception to the warrant requirement applies here. The Government relies primarily upon *South Dakota v. Opperman*, 428 U.S. 364 (1976) and *United States v. Johnson*, 410 F.3d 137 (4th Cir.) in making this argument. This argument is not persuasive, however.

The *Johnson* case summarizes the community caretaking exception concisely and states in pertinent part as follows:

> [there is] a narrow exception to the warrant requirement that permits a search even if the police lack probable cause to suspect criminal activity. Indeed, the exception applies when the police are not engaged in a criminal investigation, that is, it only applies when they are 'engage[d] in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Id.* at 144 (citing *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). Here, the search for Defendant's insurance card was not "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* Unlike the officers in *Johnson*, officers here pursued a search for Defendant's insurance card in connection with what officers believed to be his violation of a statute.[3]

In *Johnson*, United States Park Officer Bentivegna responded to a vehicle crash on the Baltimore-Washington Parkway. Mr. Johnson's vehicle was stopped in the far-right lane of a three-lane segment of the parkway. His vehicle had sustained "substantial front-end damage." *Id.* at 141. Officer Bentivegna approached Mr. Johnson's vehicle to assess his condition. He was conscious but unresponsive. Officer Bentivegna called an ambulance to the scene. While waiting

---

[3] *See* Chapter 17D of the West Virginia Code.

12

for the ambulance, Officer Bentivegna attempted to get Mr. Johnson to respond. Eventually, Mr. Johnson stated that his chest hurt. He said nothing more. Believing Mr. Johnson might respond if Officer Bentivegna called him by name, Officer Bentivegna opened the glove compartment to locate identification. There, Officer Bentivegna discovered a nine-millimeter handgun. The gun was removed, and Mr. Johnson was arrested for possessing a gun on federal property. Officers transported Mr. Johnson to the hospital for a blood draw. While at the hospital, Mr. Johnson admitted that he had smoked a "dipper," which the Court explained is a cigarette dipped in liquid phencyclidine or PCP. Mr. Johnson also admitted that he did not have a registration permit for the gun. *Id.* at 141-142.

In upholding the search, the Court in *Johnson* explained that Officer Bentivegna was "reacting to the effect of an accident" and performing "a community-caretaking function when he opened [Mr.] Johnson's glove compartment." *Id.* at 144. Importantly, the Court found that "Officer Bentivegna testified, without contradiction, that he opened the glove compartment in hopes that he would find identifying information he could use to communicate more effectively with [Mr.] Johnson so that he could assess [Mr.] Johnson's medical condition and get his car out of the traffic lane." The Court found that "[t]hese efforts fall squarely within the parameters of the community-caretaking exception." *Id.* at 144-45. The Court supported its decision by considering other cases wherein the community-caretaking exception was implicated. In particular, the *Johnson* Court noted *Cady v. Dombrowski*, 413 U.S. 433 (1973) (holding officer did not act unreasonably when he searched the trunk of a towed car that had been disabled as a result of an accident and constituted a nuisance along the highway, and where the officer found a gun which was evidence of the crime of murder). *Johnson*, 410 F.3d at 144. The instant case is quite different from either *United States v. Johnson* or *Cady v. Dombrowski*.

13

In the instant case, Defendant was responsive and was able to relay the facts of the accident when Officer Ammann made contact with him at the scene of the accident. Though he seemed to have a bit of trouble locating proof of insurance on his phone, Defendant was responsive to and compliant with Officer Ammann's request to provide his driver's license and proof of insurance. When Officer Ammann saw Defendant struggle, however, Officer Ammann told Defendant that he could provide proof of insurance after Defendant had been checked out by EMTs. On the body camera video, Officer Ammann appeared content to wait until dispatch advised that Defendant's driver's license had been suspended. It is obvious from the body camera video that, at this point, the situation took a turn.

Officers Ammann and Thompson next discuss Defendant's suspended license and appear to conclude that Defendant likely did not have valid insurance on his vehicle. It is obvious that Defendant is going to be cited for driving with a suspended driver's license. However, it is unclear whether the citation will include a charge for no proof of insurance. Rather than wait for Defendant to be assessed/treated by EMTs to obtain his insurance information (and rather than ask Defendant for it), Officer Ammann directed Officer Thompson to look for Defendant's insurance card. Thus, the search of Defendant's vehicle was conducted to determine whether Defendant had valid insurance on the vehicle, and whether Defendant had violated the law.

To the extent it might be argued that Officers were trying to find proof of insurance so that they would **not** have to cite Defendant, thus caring for him in his time of trouble, the undersigned would not be persuaded by such an argument. Mr. Williams was awake, alert, and responsive at the time of the search, and he was sitting in the ambulance on scene. He had already voiced his willingness and ability to find the proof of insurance on his cell phone. Officers therefore could have simply asked Mr. Williams to see proof of his insurance, rather than searching his vehicle.

Consequently, this search was "far more intrusive than necessary to accomplish its purpose." *Johnson*, 410 F.3d at 146.

During the hearing, Officers testified that the search and location of Defendant's insurance card was necessary so that they could complete their paperwork, i.e., the accident report and the citation for Defendant. The undersigned is not prepared to conclude that the community caretaking exception to the warrant requirement includes completion of officers' paperwork. Officers have an interest in completing paperwork. Members of the community typically do not. Additionally, the cases which involve the community caretaking exception usually involve officers taking steps to ameliorate some element which constitutes a threat to the community's safety and/or wellbeing. The undersigned cannot conclude that completing paperwork falls into this category.

The Government next argues that the gun would have been found as part of a routine inventory search conducted pursuant to Weirton Police Department Towing Policy because Defendant's car needed to be towed from the scene. Officers Thompson and Ammann testified that they were required to conduct an inventory search of Defendant's vehicle pursuant to the Towing Policy. At the hearing, the Weirton Police Department Towing Policy was introduced into evidence. It is filed at ECF No. 21-2. A review of the Towing Policy reveals, however, that an inventory search was not required in this instance.

Section 1.15A of the aforementioned document provides that "[t]o ensure the security of the vehicle and its contends, officers shall conduct an inventory search to document the condition of the vehicle and its contents prior to it being towed. Vehicle Inventory Report, shall be utilized for this purpose." Section 1.15B of the document provides that "Officers are not required to conduct vehicle inventories when the vehicle is towed at the owner/operator's request or when the owner/operator is present when the vehicle is towed." Defendant was present on scene and was

coherent and responsive when the vehicle was towed. Therefore, pursuant to Weirton Police Department's Towing Policy, an inventory search was not required. As a result, the Court cannot conclude that the gun would have been located on an inventory search.

Notwithstanding the fact that an inventory search was not required in this instance, Officer Thompson testified that he was in fact conducting an inventory search when he located the gun. Officer Thompson admitted, however, that he did not prepare the Vehicle Inventory Report as required by the Towing Policy. Officer Thompson indicated that he included the vehicle's inventory in his police report narrative. Other than the gun and the ammunition, there are no items included in Officer Thompson's narrative. Additionally, the Court notes that Officer Thompson's testimony regarding the type of search he conducted (i.e., a limited search for Defendant's insurance card, or an inventory search) changed several times. Officer Thompson's changing testimony, his failure to utilize the Vehicle Inventory Report form as directed in the Towing Policy, and the clear directive from Officer Ammann on the body camera video for Officer Thompson to get the insurance card (as opposed to 'conduct an inventory search)[4] cuts against Officer Thompson's assertion that he conducted an inventory search on Defendant's vehicle.

The Court would note that Officer Ammann's body camera video appears to directly contradict Officer Thompson's testimony on one important fact. Officer Thompson testified that, as soon as he located the gun, he stopped his search. This does not appear to be true. The body camera video depicts Officer Thompson emerge from Defendant's vehicle and call to Officer Ammann, asking him if Defendant told him that Defendant had a gun. When Officer Ammann answers in the negative, Officer Thompson appears to go back inside of Defendant's vehicle for between thirty seconds and one minute.

---

[4] An inventory search is not mentioned at any time on Officer Ammann's body camera video.

Finally, the Court would note that Officers' assertion that the insurance card was necessary to complete paperwork (which would have included the citation) is not persuasive. Officer Ammann cited Defendant for driving on a suspended license and having no proof of insurance. An insurance card is <u>not</u> necessary to write a citation for 'no proof of insurance.' Quite the contrary. Similarly, Officer Ammann did not need Defendant's insurance card to note that he did not have proof of insurance on the accident report.

Officers conducted a search without a warrant upon Defendant's vehicle. No exceptions to the warrant requirement applied at the time of the search. The evidence does not demonstrate that Officers conducted the search as part of their community caretaking duties. The Government has therefore not met its burden of proof. The evidence, i.e., the gun, located during the search should be suppressed.

## V.
## CONCLUSION

Accordingly, and for all of the foregoing reasons, the undersigned would **RECOMMEND** that Defendant's Motion [15] to Suppress Evidence be **GRANTED**.

Any party who appears *pro se* and any counsel of record, as applicable, may, within **fourteen (14) days** after being served with a copy of this Report and Recommendation file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon

such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to parties who appear pro se and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia, to the United States Marshals Service and to the United States Probation Office.

Dated: 8-25-22

JAMES P. MAZZONE
UNITED STATES MAGISTRATE JUDGE